Douglas Ray STANKEWITZ,
Petitioner–Appellant,

v.

Jeanne S. WOODFORD, Warden,
San Quentin State Prison,
Respondent–Appellee.

No. 01–99022.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 5, 2003.

Filed April 8, 2004.

Nicholas C. Arguimbau, Fairfax, CA, and Katherine L. Hart, Fresno, CA, for the petitioner-appellant.

John G. McLean, Deputy Attorney General, Sacramento, CA, for the respondent-appellee.

Before: O'SCANNLAIN, FISHER and BYBEE, Circuit Judges.

FISHER, Circuit Judge.

Douglas R. Stankewitz is on death row in California, convicted of murdering a young woman named Theresa Greybeal in 1978 by suddenly shooting her in the head after he and his friends had stolen her car and driven around for awhile with her as a captive. Stankewitz in this habeas corpus appeal seeks relief on numerous grounds challenging both the guilt and penalty phases of his trial. We reject most of these claims as explained in this opinion and in a separate memorandum disposition. We do find potential merit, however, in his claim that his counsel was unconstitutionally ineffective for failing to investigate and present substantial mitigating evidence in the penalty phase of Stankewitz's trial.

Stankewitz, who is of Native American heritage, was born into a life of abuse and deprivation. After being removed from his family's home at age six due to a severe beating by his mother, Stankewitz spent most of the rest of his youth in one state placement after another. During this time, he says he was physically and sexually abused, heavily medicated and otherwise gravely mistreated. Given the callous and impulsive manner in which Stankewitz shot his defenseless and cooperative victim to death, we conclude that counsel's failure to try to give the jury this kind of information that might have humanized Stankewitz, enabling jurors better to understand and weigh his apparently senseless act when deciding between life imprisonment or death, appears to have fallen below constitutionally acceptable professional standards.

■ "[W]here a petitioner raises a colorable claim of ineffective assistance, and where there has not been a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing." *Smith v. McCormick*, 914 F.2d 1153, 1170 (9th Cir.1990) (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1090 (11th Cir. 1987)). Having reviewed the affidavits and the record as a whole, and guided by two recent United States Supreme Court cases emphasizing counsel's duty to investigate and present mitigating evidence, we conclude that Stankewitz has raised a colorable claim of ineffective assistance of counsel during the penalty phase of the trial. *See Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Because Stankewitz has never had an evidentiary hearing on this particular claim, we remand to the district court for such a hearing.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

On the evening of February 7, 1978, Stankewitz, then 19 years old, left Sacramento, California driving a white Oldsmobile. He was headed for Fresno. In his company were his mother, brother, an older man named J.C. and three young companions—Billy Brown, Marlin Lewis and Teena Topping. The group reached Manteca at about 1 a.m. on February 8 and stopped at a 7–Eleven store to buy oil for the car.

Manteca police observed the car irregularly parked and ran a check on the license plate. They received information indicating that the car had been stolen. Several officers then approached the car and frisked several of its occupants. One of the passengers stated that she had borrowed the car from her uncle in Sacramento. Based on that information, the officers contacted Sacramento police but were unable to determine whether the car had been stolen. The officers asked the group to follow them to the police station, where the officers made another unsuccessful attempt to contact the vehicle's owner. After about an hour and a half, they were allowed to leave, but the vehicle was impounded. Before leaving, the group obtained directions to the local bus depot.

The bus depot was not open when they arrived, so the group waited at a nearby donut shop.. After several hours, Stankewitz, Brown, Lewis and Topping decided to hitchhike and obtained a ride to Modesto. Unable to get a ride any farther, the four walked to a nearby K–Mart store, where Stankewitz and Topping looked for a car in the parking lot to steal. Topping spotted a woman, the victim Theresa Greybeal, leaving the K–Mart store, and Topping, Lewis and Stankewitz followed Greybeal to her car. As Greybeal opened the car door, Topping pushed her inside and entered the car herself. Lewis jumped in the backseat and opened the passenger door, admitting Stankewitz. Brown then got into the backseat with Lewis. In the meantime, Stankewitz had produced a pistol, and Lewis had a knife.

With Topping driving, the group left the parking lot, proceeded to the freeway and turned south toward Fresno. Once on the freeway, Greybeal stated that none of this would have happened if she had had her dog with her. Stankewitz responded by pulling out his gun and stating, "This would have took care of your dog." After several miles, Topping asked Greybeal for money, and Greybeal handed Lewis $32

---

1. We generally recite the facts as established in the state court proceedings and the rulings of the California Supreme Court. *See People v. Stankewitz*, 51 Cal.3d 72, 80–86, 270 Cal. Rptr. 817, 822–25, 793 P.2d 23, 28–31 (1990) ("*Stankewitz II* ").

from her purse. She also gave her watch to Topping, commenting that she could put in an insurance claim for it.

When the group arrived in Fresno, they drove to a bar called the "Joy and Joy." Topping went into the bar and returned after a few minutes with a woman named Christina Menchaca. Menchaca joined the group, and they drove around the corner to the Olympic Hotel. Topping and Menchaca went into the hotel. A few minutes later they returned to get Stankewitz, and all three re-entered the hotel. Shortly thereafter, the three returned to the car. They appeared to be moving more slowly, and their eyes were glassy.

Topping then suggested they go to Calwa, California, to "pick up," a slang expression meaning to obtain heroin. They drove to Calwa, where Topping told everyone to get out. Brown, Lewis, Stankewitz and Greybeal exited the car. Brown asked Greybeal for a cigarette; she gave him one and took one for herself. After two or three minutes, Topping told Brown to get back in the car. Brown and Lewis re-entered the car. From inside the car, Brown saw Stankewitz walk toward Greybeal, who was standing five or six feet away, facing away from the car. Stankewitz raised the gun in his left hand, braced it with his right hand and shot Greybeal once in the head from the distance of about one foot. Greybeal fell to the ground, fatally wounded.

After shooting Greybeal, Stankewitz got into the car and said, "Did I drop her or did I drop her?" As Topping drove away, Stankewitz said to her, "Drive carefully. We don't want to get caught." Later that evening, the group drove to Clovis, California, where Stankewitz unsuccessfully tried to sell Greybeal's watch. In Clovis, Brown learned that his mother had filed a missing person's report on him and asked to be driven home. When he arrived home, Brown began to cry and told his mother what had happened. His mother called the police, and an investigator came to the house and took a statement from Brown. Later that evening, Fresno police apprehended Stankewitz, Topping and Lewis, still in possession of Greybeal's car. The pistol that was used to kill Greybeal was found in the car. The police recovered Greybeal's watch from Menchaca, who was nearby, and arrested her as well.

By amended information filed on July 6, 1978, Stankewitz was charged with the murder, robbery and kidnaping of Greybeal, all committed with the use of a firearm. The information alleged two special circumstances: the murder (1) was willful, deliberate and premeditated and (2) was personally committed by Stankewitz during the attempted commission of a robbery and a kidnaping. Stankewitz pleaded not guilty to all charges and denied the firearms allegations and special circumstances.

Brown, Lewis, Menchaca and Topping were also charged with murder. Brown's charges were later dropped in return for his testimony against Stankewitz; the charges against Lewis, Menchaca and Topping were severed. Lewis, Menchaca and Topping successfully moved for change of venue based on excessive pretrial publicity. Menchaca and Topping were allowed to plead guilty as accessories and did not receive state prison time. Lewis pled guilty to second-degree murder.

### The 1978 Trial

On July 3, 1978, two days before the trial was set to begin, Stankewitz's public defender informed the court that he had come to doubt Stankewitz's mental competency to stand trial. *See People v. Stankewitz,* 32 Cal.3d 80, 88, 184 Cal.Rptr. 611, 648 P.2d 578 (1982) ("*Stankewitz I*"). A court-appointed expert examined Stankew-

itz and testified that Stankewitz had a mental defect which prevented him from rationally assisting his public defender, but that Stankewitz might cooperate with appointed private counsel. *See id.* at 88, 184 Cal.Rptr. 611, 648 P.2d 578. The court declined to hold a competency hearing and refused Stankewitz's later motion for substitution of counsel. *See id.* at 89–90, 184 Cal.Rptr. 611, 648 P.2d 578.

At trial, counsel presented a diminished capacity defense based upon mental defect, against Stankewitz's wishes. *See id.* at 86, 89, 184 Cal.Rptr. 611, 648 P.2d 578. The jury convicted Stankewitz of all charges and sentenced him to death. *See id.* at 87–88, 184 Cal.Rptr. 611, 648 P.2d 578. The California Supreme Court reversed this conviction upon automatic appeal, holding that the trial court had erred by not taking any action to unravel the dispute between the public defender and Stankewitz. *See id.* at 94, 184 Cal.Rptr. 611, 648 P.2d 578. The court held that because Stankewitz had refused to cooperate with the public defender, the trial court should have at least substituted counsel if not held a full competency hearing. *See id.*

### The 1983 Trial

Before the start of the second trial, Stankewitz was accorded a competency hearing and hearing pursuant to *People v. Marsden,* 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970), to determine whether there was a conflict between Stankewitz and the public defender who had been appointed to represent him. *See Stankewitz II,* 51 Cal.3d at 80, 270 Cal.Rptr. 817, 793 P.2d 23. The court found such a conflict, relieved the public defender and appointed private counsel, Hugh Goodwin. *See id.* at 80–81, 270 Cal.Rptr. 817, 793 P.2d 23. The court deemed Stankewitz competent to stand trial as Stankewitz had refused to be interviewed by two court-

appointed psychiatrists and there was no other evidence of incompetence presented. *See id.*

During the guilt phase of the trial, the state presented 15 witnesses; Goodwin presented no evidence. In keeping with Stankewitz's wishes, Goodwin did not present a diminished capacity defense and instead focused his efforts on attacking the testimony of Billy Brown, who named Stankewitz as Greybeal's shooter. At the penalty phase, the prosecution presented 17 witnesses; Goodwin presented four live witnesses and, by stipulation, the testimony of two other witnesses by affidavits. Stankewitz did not testify at either the guilt or penalty phase.

The prosecution's penalty-phase witnesses included Jesus Meraz, a farm worker who testified he was robbed by Menchaca and others he could not see; George Key, who was robbed and badly beaten by Stankewitz and others in 1973 when Key was 70; and Steven Reid, a California Highway Patrol officer who was shot in the head while participating in a high-speed chase after a car in which Stankewitz, along with his brother Johnnie, was a passenger. These and other witnesses testified to numerous incidents of Stankewitz's violent and criminal behavior:

- *Robbery and assault of George Key.* George Key and his wife, Neva Key, testified about the severe beating that Stankewitz and a companion administered to Mr. Key when they stole his car on April 24, 1973.

- *Shootout with Officer Reid.* Officer Reid, who chased after Eddie Davis and Johnnie and Doug Stankewitz in Key's stolen car, testified that he saw only two people in the stolen car and that, after Davis was shot, Stankewitz was found in the car after the shootout ended. In his closing argument,

the prosecutor implied that Stankewitz must have shot Officer Reid.

- *Attack at the Youth Training School.* Thomas Walker, a counselor for the California Youth Authority, testified that Stankewitz kicked and bit him during a scuffle that occurred on July 20, 1975 when Stankewitz was not permitted to go to the gym.

- *Robbery and kidnaping of Jesus Meraz.* Meraz testified that Christina Menchaca invited him to a car on February 8, 1978, where he was robbed while someone threatened him with a knife and a man resembling Stankewitz threatened him with a gun. Meraz's belt was later found in the car that the group took from Greybeal.

- *Stabbing of Carl Hogan.* Several witnesses testified that Stankewitz stabbed fellow inmate Carl Hogan in the neck while incarcerated in San Quentin prison. Stankewitz told Officer James Crowder that it was inmate code to kill Hogan because Hogan "had killed a kid."

- *Attack on Sheriff Dominick Damore.* Sheriff Damore testified that Stankewitz attacked him and several officers who were attempting to take a photograph of Stankewitz for booking on April 18, 1977. According to Damore, it took five people to subdue Stankewitz.

- *Attack on guards.* Officer William Yount testified that Stankewitz attacked him and other guards who attempted to get Stankewitz to stop talking to another prisoner while being transferred on March 2, 1982.

- *Light bulb attack.* Sergeant Steve Szmaciarz testified that Stankewitz threw a light bulb toward him through the bars of Stankewitz's cell on December 13, 1980. The bulb shattered, sending fragments into Szmaciarz's face.

- *Liquid attack.* Sergeant Charles Caraway testified that Stankewitz, along with three other inmates, threw a liquid at an inmate in San Quentin on January 28, 1982.

By contrast, Goodwin presented the following witnesses at the penalty phase:

- *Glenn E. Davis,* a jail chaplain at Fresno County Jail, testified as a Christian that anyone who is converted can change. He did not mention Stankewitz until cross examination, when he testified that Stankewitz had shown no interest in conversion and that he had not recently expressed any interest in counseling to Davis.

- *Don Penner,* an assistant district attorney for the County of Fresno appearing under subpoena served the previous day, testified that he had no doubt "about the power of God to change a person's life," but did not speak specifically about Stankewitz and added on cross-examination that he was not "opposed to the death penalty as a general principle."

- *Theresa Montgomery,* Stankewitz's sister-in-law, testified in general terms about conditions on the reservation. She also noted that Stankewitz and his family could have a positive impact on the reservation in that people on the reservation "would look at life in a different perspective ... [b]y what's going on ... To see what he's gone through and what he's going through ... so they can see where they're headed."

- *Joe Walden,* Stankewitz's juvenile probation officer at age six, testified about Stankewitz's family, Stankewitz's history as a ward of the state and two instances of child abuse.

- *Sheriff of Fresno County Harold McKinney* testified by stipulation that he was familiar with, and favorably impressed by, the work done by jail chaplains.
- *Jean Shacklett,* a parole investigator, testified during Stankewitz's first trial that on February 8, 1978 she saw "what [she] thought was a needle mark" on Stankewitz's arm. She did not testify about Stankewitz's drug use at any time or about use on the day of the offense. At Stankewitz's second trial, Goodwin, by stipulation, read portions of Shacklett's previous testimony into evidence.

Stankewitz was found guilty of murder with special circumstances, robbery and kidnaping. The jury fixed the penalty as death. On November 18, 1983, the court pronounced a judgment of death against Stankewitz. Upon automatic appeal, the California Supreme Court affirmed the judgment in its entirety, *Stankewitz II,* 51 Cal.3d 72, 270 Cal.Rptr. 817, 793 P.2d 23 (1990), and the U.S. Supreme Court denied Stankewitz's timely petition for writ of certiorari.

### *Collateral Attacks*

Stankewitz filed an initial habeas petition in the California Supreme Court on February 2, 1990, which was denied without hearing and without any specific findings on April 19, 1990. On October 17, 1994, Stankewitz filed a habeas petition in federal district court under 28 U.S.C. § 2254. Because several claims were unexhausted, the district court stayed the proceedings to enable Stankewitz to exhaust the claims. After the California Su-

preme Court rejected these claims, Stankewitz filed an amended habeas petition on May 18, 1996.

On August 4, 1999, the district court granted Stankewitz an evidentiary hearing on five of his claims: (1) incompetence to stand trial and (2) Goodwin's ineffective assistance of counsel based on failing to investigate or present (a) Stankewitz's incompetency, (b) his various mental illness issues, (c) a diminished capacity defense and (d) mitigating evidence in the penalty phase. A little more than one year later, the district court revoked this ruling in a one-paragraph order, stating only that the evidentiary hearing had been "improvidently granted" and was "unnecessary."

The district court denied the petition in a final order dated December 22, 2000. Stankewitz's motion for reconsideration was denied on November 7, 2001, and Stankewitz filed a timely notice of appeal on December 6, 2001.

### AEDPA Does Not Apply

■ The district court concluded that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to Stankewitz's petition. We agree, but on different grounds.

Stankewitz's original petition, filed prior to AEDPA's effective date, contained exhausted and unexhausted claims.[2] As a result, the district court stayed the proceedings and ordered Stankewitz to file a state habeas petition containing his five unexhausted claims with the California Supreme Court. It is not clear whether the district court dismissed only the unexhausted aspects of the petition and held

---

**2.** Of the five unexhausted claims, only three claims (that Goodwin had a conflict of interest due to his representation of Johnnie Stankewitz; that jurors provided false statements on voir dire; and juror misconduct with regard to the meaning of life without the possi-

bility of parole) are before us, either as claims we are considering on the merits or claims for which Stankewitz seeks a broader certificate of appealability. All three are discussed in the memorandum disposition filed simultaneously with this opinion.

the exhausted petition in abeyance, *see Smith v. Ratelle,* 323 F.3d 813, 818 (9th Cir.2003) (describing "withdrawal-and-abeyance" procedure as one where the district court "stay[s] the petition after dismissal of unexhausted claims, in order to permit [p]etitioner to exhaust those claims and then add them by amendment to his stayed federal petition") (internal quotation marks omitted), or whether it attempted to maintain jurisdiction over a mixed petition.[3]

On May 18, 1996—after AEDPA's effective date—Stankewitz filed the amended petition that is the subject of this appeal. The district court concluded that AEDPA does not apply because Stankewitz had filed a request for counsel, a motion for stay of execution and his original petition before AEDPA's effective date. *See Calderon v. United States Dist. Ct.,* 163 F.3d 530, 539–40 (9th Cir.1998) (expressing the circuit's rule that a request for appointment of counsel and stay of execution constituted a case "pending" prior to AEDPA's effective date), *abrogated by Woodford v. Garceau,* 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (holding that whether the AEDPA governs depends on whether the petitioner had filed an application for habeas relief seeking an adjudication on the merits prior to AEDPA's effective date).

Because of *Garceau,* we can no longer look to the date that a petitioner requested appointment of counsel and a stay of execution. The district court's reliance on the date that Stankewitz filed his original petition remains sound, however. An analogous situation occurred in *Williams v. Calderon,* 83 F.3d 281 (9th Cir.1996), where a petitioner had filed a pre-AEDPA petition and then later sought to amend the petition to add claims that were exhausted after AEDPA's effective date. *Id.* at 285. We were faced with the question of whether AEDPA's successive petitions provision, 28 U.S.C. § 2244(b)(3)(A), applied to the petition. We first concluded that AEDPA unquestionably did not apply to the claims in the petition filed pre-AEDPA, even though re-filed after. AEDPA's effective date. 83 F.3d at 285. The provision's application to the other claims filed for the first time post-AEDPA "pose[d] more of a problem." *Id.* In the end, we "assume[d], without deciding" that the act did not apply, "be even giving him the benefit of the more favorable pre-enactment law, we deny his claims." *Id.* at 286.

Following *Williams,* we hold that AEDPA does not apply to the claims that were exhausted when Stankewitz filed his original petition and assume without deciding that AEDPA does not apply to the claims that were unexhausted at the initial filing, because even giving Stankewitz the benefit of the more favorable pre-enactment law, we deny those claims, as discussed in greater detail in the disposition filed concurrently with this opinion. Accordingly, we will apply pre-AEDPA standards to Stankewitz's claims.

## DISCUSSION

Stankewitz alleges that his trial counsel was ineffective because he failed to investigate and present social background and mental health evidence in mitigation during the penalty phase of the trial. We review this claim under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Stankewitz must establish that his counsel's performance was deficient and

---

**3.** After the district court's actions in this case, we made clear that a district court may not maintain jurisdiction over a mixed petition. *See Calderon v. United States Dist. Ct.,* 107 F.3d 756, 761 (9th Cir.1997).

that it prejudiced the outcome of his trial. *Id.* at 689, 694, 104 S.Ct. 2052. The legal question of whether a defendant received ineffective assistance of counsel is reviewed de novo, while any factual findings of the district court are reviewed for clear error. *See Mancuso v. Olivarez,* 292 F.3d 939, 949 (9th Cir.2002). Under pre-AEDPA standards, and because Stankewitz did not receive an evidentiary hearing in state court, Stankewitz is entitled to an evidentiary hearing if he alleges facts that, if true, would entitle him to relief. *See Williams v. Woodford,* 306 F.3d 665, 684 (9th Cir.2002); *Beaty v. Stewart,* 303 F.3d 975, 993 (9th Cir.2002), *cert. denied,* 538 U.S. 1053, 123 S.Ct. 2073, 155 L.Ed.2d 1098 (2003).

We review de novo the district court's decision to deny Stankewitz's § 2254 petition, *Alcala v. Woodford,* 334 F.3d 862, 868 (9th Cir.2003), and we review for abuse of discretion the court's refusal to hold an evidentiary hearing, *see Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir.1999).

## I. *Wiggins* and *Williams*

In applying *Strickland's* ineffective assistance standard to the penalty phase of Stankewitz's trial, we are guided by two recent decisions in which the Supreme Court concluded that counsel was constitutionally ineffective for failing to investigate and present mitigating evidence. *See Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2544, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 394, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Applying the exacting AEDPA standards not applicable to Stankewitz's ineffective assistance claim, the Court in *Wiggins* and *Williams* concluded that the defendants there had received ineffective assistance of counsel during the penalty phases of their trials. These two cases make clear that the presentation of mitigating evidence is vital even where, as here, the aggravating evidence is powerful.

### A. *Wiggins*

Wiggins was convicted of first-degree murder for drowning a 77–year–old woman. *Wiggins,* 123 S.Ct. at 2531–32. At sentencing, counsel did not present any mitigating evidence, although one counsel told the jury that Wiggins had "had a difficult life," had "tried to be a productive citizen" and had "reached the age of 27 with no convictions for prior crimes of violence and no convictions, period." *Id.* at 2532. Counsel failed to present extremely persuasive evidence of Wiggins' "bleak life history": Wiggins' mother was an alcoholic and abusive to Wiggins and his siblings, and on one occasion placed Wiggins' hand on a hot stove burner. Wiggins entered foster care at age six, and was physically abused by his first two foster mothers. He was repeatedly raped and molested by his second foster father. At age 16, Wiggins ran away from his foster home and began living on the streets. He returned intermittently to foster homes, including one in which the foster mother's sons allegedly gang-raped him. *Id.* at 2533–34.

In measuring counsel's performance, the Court looked to "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" *Wiggins,* 123 S.Ct. at 2536. It concluded that the investigation was not reasonable because counsel failed to expand their investigations beyond arranging for psychological tests and reading the pre-sentencing investigation report and records kept by the Baltimore City Department of Social Services regarding Wiggins' various foster placements. *Id.* at 2536–37. The lack of investigation was particularly unreasonable, the Court concluded, because the

DSS records included several hints as to Wiggins' childhood. *Id.*

The Court also concluded that Wiggins had been prejudiced by counsel's failure to investigate because the jury heard only one mitigating factor—that Wiggins had no prior convictions. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 2543.

## B. *Williams*

In *Williams,* after the petitioner was convicted of robbery and murder, the state presented evidence about his violent and lengthy criminal history. 529 U.S. at 368, 120 S.Ct. 1495. Williams had been convicted of armed robbery in 1976 and grand larceny in 1982. The aggravating evidence also included two separate violent assaults on elderly victims. The evidence regarding an assault on an elderly woman was "particularly damaging," as other evidence was presented that the woman was in a "vegetative state" and not expected to recover. Williams had also been convicted of arson for setting a fire in the jail while awaiting trial in this case. Two expert witnesses employed by the state testified that there was a high probability that Williams would pose a serious, continuing threat to society. *Id.* at 368–69, 120 S.Ct. 1495.

By contrast, little evidence was presented in mitigation. Williams' mother and two neighbors—one of whom was asked to testify on the spot after defense counsel spotted her in court—testified that Williams was a "nice boy" and not a violent person. 529 U.S. at 369, 120 S.Ct. 1495. A taped excerpt from a psychiatrist also noted that Williams had told the psychiatrist that, in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone. The weight of defense counsel's closing argument "was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." *Id.*

The Supreme Court concluded that counsel's performance fell short of professional standards because, without any strategic explanation, they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood." 529 U.S. at 395, 120 S.Ct. 1495. "Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *Id.* (footnote omitted). Counsel failed to introduce evidence that Williams was borderline mentally retarded and had not advanced beyond sixth grade, as well as evidence of commendations for his behavior in prison. *Id.* at 396, 120 S.Ct. 1495.

Thus, notwithstanding counsel's presentation of some mitigating evidence, the Court concluded that Williams had been prejudiced by this failure to investigate because "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." 529 U.S. at 398, 120 S.Ct. 1495. This background bolstered the theory that "in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation." *Id.*

Together, *Wiggins* and *Williams* stand for the proposition that counsel's failure to investigate and present mitigating evidence presents serious constitutional concerns. Both cases emphasize counsel's duty to conduct a thorough investigation, and *Williams* in particular shows that counsel's duty is not discharged merely by presenting some limited evidence. Rather, a penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented. In short, these two cases require us to scrutinize closely Goodwin's performance in putting on Stankewitz's penalty phase defense.

## II. Counsel's Performance

■ Stankewitz argues that Goodwin's mitigation presentation was "perfunctory" and that Goodwin failed to investigate and introduce available, vital evidence of Stankewitz's childhood of abuse, poverty and institutionalization; his mental deficiencies amounting to borderline retardation; and his drug and alcohol abuse exacerbating his disturbed emotional state, particularly in the days leading up to the killing. Here, *Wiggins* and *Williams* compel our conclusion that Stankewitz has presented a colorable claim regarding Goodwin's mitigation presentation. Specifically, the declarations Stankewitz has submitted strongly suggest that Goodwin failed sufficiently to investigate and present evidence that may have affected the jury's assessment of Stankewitz's moral culpability. We shall summarize the mitigating evidence actually presented, the mitigating evidence that Stankewitz claims should have been presented and then discuss the strength of

Stankewitz's claim in light of *Wiggins* and *Williams*.

## A. Mitigation Evidence Presented

The mitigation evidence presented was minimal, consisting of testimony from six witnesses (only four of whom were actually in court) and covering only approximately 50 pages in the transcript. Two witnesses primarily offered generic testimony about the "power of God" to help persons change their lives, and the parties stipulated that a third witness would have testified regarding his admiration of the work of prison chaplains. This testimony apparently was intended to elicit mercy from the jury. But the plan had little hope of succeeding, and indeed seemed predestined to fail: The prison chaplain, Davis, acknowledged that although he had counseled Stankewitz, he had no reason to believe that Stankewitz had undergone any kind of spiritual conversion. The other testifying witness, assistant district attorney Penner, testified about his religious conviction that God can change lives, but did not have anything to say about Stankewitz, and affirmed his general support for the death penalty. The third witness, whose testimony was admitted by stipulation, was the county sheriff.[4] Goodwin acknowledged that he "knew it was likely that on cross-examination [Davis and Penner] would state that there was no evidence that Mr. Stankewitz would let God into his life," but "believed that by presenting this testimony, God's will would be done, and accordingly [he] did so."

Goodwin also read into evidence the testimony of a parole investigator who observed Stankewitz the day after the shooting and testified that she had seen on his

---

4. The entire stipulation read:
   If Sheriff Harold McKinney were called to testify, he would testify that he is the Sheriff of Fresno County, that he is familiar with the work that the chaplains are doing in the jail. And that he is favorably impressed with the work that they are doing.

arm what appeared to be infected sores and needle marks. The testimony, originally given at Stankewitz's first trial, did not link the sores and needle marks with drug use, however. A fifth witness, a relative of Stankewitz's by marriage, testified primarily in general terms about the deprivations of life on an Indian reservation. On cross-examination, she also provided a glimpse of Stankewitz's life by testifying that Stankewitz had been in several foster homes and had attended high school"[f]or a period of time."

The witness who provided the most information about Stankewitz's history was Joe Walden, the Director of Juvenile Probation for the Fresno County Probation Department. Although he summarized Stankewitz's life chronology, starting from his suffering a severe beating at age six and continuing through his childhood placements in one state institution after another, Walden did not provide the sort of detailed information that Stankewitz now alleges. In addition, on cross-examination, Walden confirmed that the doctors who examined Stankewitz when he was six found no evidence of a psychosis or organic disorder. Walden also said that Stankewitz had created problems in the foster homes to which he had been sent.

In his closing argument, Goodwin focused little on the actual details of Stankewitz's life. The bulk of his summation focused on rebutting the existence of the special circumstances required for a death sentence and addressing the state's aggravating evidence. Goodwin pointed to Stankewitz's background only by referring to the prevalence of drug and alcohol abuse on Indian reservations and by stating that Stankewitz had to raise himself and thus was never taught right from wrong by his parents, by his community or by a religious institution. He concluded by stating

that he believed that Stankewitz deserved to live because he could change.

## B. Mitigation Evidence That Could Have Been Presented

Stankewitz asserts that his penalty phase presentation would have materially benefitted from information about his troubled social background, his history of mental illness and his use of drugs and alcohol before the killing. Stankewitz's petition and declaration paint the following picture of information that he argues should have been discovered and presented at the penalty phase.

Stankewitz first points to evidence about his difficult and traumatic youth, which one psychiatrist described as "totally lacking in love, warmth and affection and frequently filled with deprivation, rejection and punishment." He was born into a poverty-stricken household where there was often not enough food for the 10 children; the house was dirty, filled with vermin and without running water or electricity. By age five, Stankewitz had started sniffing paint and soon expanded into the use of alcohol and harder drugs. Stankewitz was also physically and mentally abused by both of his parents. The abuse began before Stankewitz was born, as his mother drank alcohol excessively while pregnant with Stankewitz; she was also physically abused by Stankewitz's father, who struck her repeatedly in the abdomen. Stankewitz was taken to the emergency room three times before his first birthday.

Stankewitz's father was a violent man, who ridiculed Stankewitz for being light-skinned and told him not to take the pills prescribed to control Stankewitz's behavior.[5] At age six, Stankewitz's mother beat him so badly with an electrical cord that she was jailed and he was placed in the

---

**5.** Stankewitz's father, now deceased, was of Native American descent.

care of the state. Stankewitz's older siblings were also abusive to the younger children, especially Stankewitz. At least one visible scar—"a substantial indentation on his cranium"—remains as a reminder of the physical abuse.

Once removed from his home, Stankewitz was shuffled from one state institution to another. Stankewitz's entree into the state's "care," at Napa State Hospital, was indicative of the rest of his time as a ward. While at the hospital, he claims to have been sexually abused by the hospital staff, heavily medicated and placed among psychotic and autistic children even though he was not similarly diagnosed. He was placed in a foster home after leaving Napa. During the ride from the hospital, he completely tore apart the back seat of his foster mother's car. Upon arrival at the foster home, he was "like a wild animal" and had to be held down by three teenage boys. He was prescribed extremely high doses of medication and would often wet the bed and defecate in it, smearing feces on the wall. He continued wetting the bed until at least age 12.

His foster mother had to teach him how to talk instead of grunt, use the toilet, dress himself, use silverware and ask instead of grab.

Stankewitz later was removed from the foster home and spiraled rapidly through 22 subsequent placements in eight years. From March 6, 1965, when Stankewitz was first placed in Napa Hospital, until his arrest for Greybeal's murder—a period of nearly 13 years—Stankewitz spent all but 16 months in one form or another of government care. During these placements,

"he was massively and unnecessarily drugged, tied to beds, beaten, sexually molested, neglected, deliberately tortured, and otherwise abused by staff."

Stankewitz also points to a history of mental illness. One of the experts who testified at Stankewitz's first trial noted that Stankewitz appeared "not to be fully able to appreciate the flow of events or full implications of his actions" and that he would have testified at the second trial. All three experts retained by Stankewitz to submit analyses in support of his habeas petition agreed that Stankewitz is brain-damaged.[6] Dr. Riley opined that Stankewitz is borderline retarded, with an IQ of 79, and suffers from significant brain dysfunction, perhaps attributable to Fetal Alcohol Syndrome and childhood abuse. Dr. Rosenthal stated that Stankewitz's brain damage "would produce problems with emotional control, tendencies to be impulsive and unpredictable, and to be unable to exercise adequate judgment or to understand the consequences of his behavior. Furthermore, from early childhood Mr. Stankewitz had intense mood shifts, profound depressions with suicidal tendencies, psychotic thinking, an inability to relate to reality in a rational manner, and paranoid delusional thinking." A report written about Stankewitz when he was 12 reveals that he suffered from problems with a "sudden loss of control, during which he becomes abusive, uses vile language, and actually becomes combative." During one of these fits, he was placed in a padded room at Juvenile Hall and was observed "actually biting the walls."

---

6. The district court rejected some, but not all, of the conclusions of these experts in denying Stankewitz's guilt-phase claims of diminished capacity and insanity. The remaining conclusions, however, even if "not enough to negate an element of the underlying offense, ... could have invoked sympathy from at least one member of the jury at the penalty phase, particularly when considered in connection with additional sociological history evidence...." *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir.2003).

Finally, Stankewitz claims that, for at least the 48 hours before the murder, he had binged on substantial quantities of alcohol, heroin and methamphetamine, and had not slept. He also claims to have injected the largest dose of heroin he had ever taken shortly before killing Greybeal. He thus claims that his already diminished ability to control his behavior was lessened. In addition, Stankewitz had a "very severe" substance abuse problem dating back from as early as age 10 or younger. This long history of drug and alcohol abuse, he maintains, likely aggravated his unstable emotional state and limited mental capacity.

### C. Counsel's Investigation

Following the Supreme Court's approach in *Wiggins* and *Williams*, we first "focus on whether the investigation supporting [Goodwin]'s decision not to introduce mitigating evidence of [Stankewitz]'s background *was itself reasonable*." *Wiggins*, 123 S.Ct. at 2536; *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (noting that other courts have held that "counsel is not deficient for failing to find mitigating evidence if, *after a reasonable investigation*, nothing has put the counsel on notice of the existence of that evidence.") (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir.1997) (emphasis added)).

We have serious concerns that Goodwin's investigation fell below reasonable expectations, particularly because "[w]hen it comes to the penalty phase of a capital trial, '[i]t is imperative that all relevant mitigation information be unearthed for consideration.'" *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir.) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)), *cert. denied*, —— U.S. ——, 124 S.Ct. 49, 157 L.Ed.2d 23 (2003). While "[t]his duty to investigate is not limitless" and "does not necessarily require that every conceivable witness be interviewed," there is no record evidence that Goodwin ever hired an investigator or interviewed Stankewitz's teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent significant time with him during his childhood and youth. *Id.* (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995)). According to Goodwin's declaration, he did not interview anyone involved in Stankewitz's first trial and thus did not know about the existence of any diagnoses of Stankewitz's mental capabilities. Goodwin did not procure a psychological examination of Stankewitz—even though he believed that Stankewitz was not mentally competent as a result of "erratic and bizarre" behavior during pretrial and trial proceedings—because he felt that it was not his responsibility to do so. Goodwin also did not seek to obtain any written records related to Stankewitz's background, such as school records, the records of his hospitalization at Napa Hospital, his medical records or any records from the California Department of Corrections or the Fresno County Jail. According to his declaration, Goodwin did not investigate, and was unaware of, Stankewitz's history of drug and alcohol abuse, and the fact that the drug and alcohol abuse was continuing at the time Goodwin was representing him.[7] Goodwin

---

**7.** Stankewitz also claims that Goodwin offered ineffective assistance in the guilt phase of the trial because he did not adequately investigate and present evidence of Stankewitz's drug use on the day of the shooting. According to Stankewitz, such evidence could have supported a diminished capacity defense.

In the guilt phase, Goodwin chose to attack the credibility of Billy Brown, the only person present during the kidnaping to testify against Stankewitz. A diminished capacity defense would have undercut that choice by tending

did not take these steps to look into Stankewitz's life history, despite tantalizing indications in the record, as in *Wiggins,* that "would lead a reasonable attorney to investigate further." 123 S.Ct. at 2538.

Goodwin also failed to investigate and rebut the prosecution's aggravating evidence. In its penalty phase presentation, the state presented testimony regarding Stankewitz's participation in a car chase and shootout with a police officer. To support his argument that Stankewitz had shot the officer, the prosecutor elicited testimony from Officer Reid, who stated that Stankewitz was the only passenger that he saw (aside from the driver) in the car from which the shots were fired. Based on this testimony, the prosecutor argued to the jury that Stankewitz must have shot Officer Reid.

In his submissions, Stankewitz has provided evidence that he was in fact one of two passengers in the car, other than the driver.[8] The other passenger was Stankewitz's older brother. There is substantial evidence that Goodwin knew this fact, because it was contained in the transcript of the first trial as well as in the statement Stankewitz's brother made to authorities after the incident. At the beginning of the penalty phase, the prosecutor even mentioned that Stankewitz's brother should have been ordered to be available as a witness because "[t]he other side is well aware that [Stankewitz's brother] was present during part of an incident in 1973 that was the subject matter of one of the circumstances in aggravation." Yet despite these various references to the involvement of Stankewitz's brother in the 1973 shootout, which potentially contradicted the prosecution's theory that Stankewitz must have shot Officer Reid, Goodwin never called Stankewitz's brother to testify or cross-examined Officer Reid about this fact.

The evidence and witnesses Goodwin did pursue he obtained with very little effort. As noted, Jean Shacklett's testimony from the first trial was merely read into evidence. Theresa Montgomery Stankewitz says that she became a witness in the penalty phase because of a chance meeting with Goodwin in the courthouse, rather

---

to corroborate Brown's version of the facts. Thus, Goodwin's failure to raise Stankewitz's drug use at the guilt phase was a tactical decision that reflected his client's wishes. Accordingly, Goodwin was not unconstitutionally ineffective for failing to present a diminished capacity defense. An attorney's performance is not deficient where, as here, it reflects a reasonable strategic choice that aligns with his client's wishes. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Bean v. Calderon,* 163 F.3d 1073, 1082 (9th Cir.1998). The penalty phase, however, is another matter. There, no tactical or strategic reason explains why Goodwin would have failed to investigate or provide evidence of Stankewitz's drug use. At that stage, the jury had already concluded that Stankewitz shot Theresa Greybeal. Evidence of drug use could only have made that shooting appear less deliberate and more impulsive, which

might have helped influence the jury to spare Stankewitz the death penalty.

8. Stankewitz claims that Officer Reid's testimony was misleading and that the prosecutor's role in presenting this misleading evidence violated Stankewitz's due process rights. A criminal conviction obtained through the prosecutor's knowing use of perjured testimony violates due process. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Further, a prosecutor has a constitutional duty to correct evidence he knows is false. *Hayes v. Woodford,* 301 F.3d 1054, 1072 (9th Cir.2002).

Although the testimony the prosecutor elicited may not have portrayed the full story of the incident, it was neither false nor perjured. Officer Reid saw only two people in the car while chasing it and being fired upon. Therefore, the prosecutor did not violate Stankewitz's due process rights in presenting this evidence.

than because of an effort by Goodwin to seek her out. *See Williams,* 529 U.S.. at 369, 120 S.Ct. 1495 (noting that one of three mitigation witnesses was asked to testify on the spot after defense counsel spotted her in the courtroom). The final three mitigation witnesses were more relevant to Goodwin's interest in religion than in providing mitigating information about Stankewitz.[9]

In a declaration, Goodwin admits that he conducted very little investigation into mitigating evidence and explains:

> Mr. Stankewitz made it clear he was opposed to any penalty phase defense at all and in particular any defense that involved the use of his family as witnesses or the use of expert witnesses. I accepted Mr. Stankewitz's opposition at face value and did not interview any family members or expert witnesses for possible use at [the] penalty phase nor did I engage in any further discussion with Mr. Stankewitz in an attempt to make him see the consequences of failure to put on a strong penalty defense.

Thus, the only tactical rationale on the record is that Stankewitz purportedly was opposed to a penalty phase defense.

Goodwin's acquiescence in Stankewitz's purported opposition was not reasonable.

First, Stankewitz's supposed opposition to "any penalty phase defense" is belied by the record. Goodwin did introduce penalty phase witnesses, including a member (by marriage) of Stankewitz's family. Stankewitz, whose willingness to object verbally when he disagreed with the decisions of counsel or the court was vividly demonstrated by the transcripts of both trials, did not object to this testimony. This suggests either that Stankewitz did not object to the testimony of family members or that Goodwin could have convinced Stankewitz to accept such evidence if Goodwin had conducted a proper investigation and presented the evidence to Stankewitz.

Second, Goodwin has alleged that Stankewitz did not want his family used as witnesses; but he does not claim that Stankewitz objected to his family being interviewed or to an investigation that relied on non-family members. We have previously held that opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or

---

**9.** Stankewitz argues that Goodwin's intense faith created a conflict of interest between his religion and his duty to represent Stankewitz. If an attorney labors under an actual conflict of interest that adversely affected his representation, prejudice is presumed and the defendant is entitled to relief. *See Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). We can find no authority to support finding a conflict of interest stemming from an attorney's religion, however. Nor has Stankewitz identified a specific tenet of Goodwin's faith that created an actual—as opposed to merely theoretical—conflict with Stankewitz's interests. *See Bonin v. Calderon,* 59 F.3d 815, 826 (9th Cir. 1995) (holding defendant must show a "direct conflict" between his interests and those of his attorney). We therefore affirm the district court's denial of a certificate of appealability

as to this novel claim because we do not believe reasonable jurists would disagree with the district court's ruling. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

Similarly, we reject Stankewitz's argument that Goodwin was unconstitutionally ineffective during closing argument for mentioning the Bible and the power of God to change people's lives. Goodwin's argument was designed to highlight Stankewitz's poor upbringing and to seek mercy from the jury. Counsel has wide latitude to craft a closing argument, *see, e.g., Yarborough v. Gentry,* — U.S. ——, 124 S.Ct. 1, 4–5, 157 L.Ed.2d 1 (2003), and Goodwin's invocation of religious themes did not itself render his approach unreasonable. Nor, we stress, does it relieve Goodwin of his obligation to investigate properly mitigating evidence.

from investigating documents containing mitigating evidence. *See Silva v. Woodford*, 279 F.3d 825, 840 (9th Cir.2002) ("Silva's directive [against calling his family members as witnesses] did not automatically require foregoing all inquiry into his past."); *cf. Hayes v. Woodford*, 301 F.3d 1054, 1067 (9th Cir.2002) (distinguishing *Silva* where defendant made clear to counsel that he did not want his family members called as witnesses *or* involved in any investigation). Stankewitz's supposed opposition also should not have prevented Goodwin from attempting to rebut the prosecution's aggravating evidence, such as by challenging Officer Reid's testimony about the shoot-out, discussed above.

Thus, Stankewitz's supposed opposition to mitigating evidence cannot explain Goodwin's tactics. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 123 S.Ct. at 2535 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). While we have emphasized that "[t]he client's wishes ... inform our view of the reasonableness of a particular course of action taken by counsel," *Hayes*, 301 F.3d at 1067; *see Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."), in most circumstances a lawyer may rely on his client's decision against presenting mitigating evidence only after completing an appropriate investigation and only where the client's decision is "informed and knowing." *Williams v. Woodford*, 306 F.3d 665, 720 (9th Cir.2002) ("A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing."). *See Williams*, 529 U.S. at 396, 120 S.Ct. 1495 ("[T]rial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." (citing 1 ABA Standards for Criminal Justice 4–4.1 cmt. at 4–55 (2d ed.1980))); *Silva*, 279 F.3d at 840 ("While not directly addressing a situation where a client purportedly seeks to prohibit an attorney from investigating his background, these guidelines suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." (citing 1 ABA Standards for Criminal Justice 4–4.1 cmt. at 4–55 (2d ed.1980))). Here, Stankewitz's purported objection to mitigating evidence appears not to have been "informed and knowing" because there is no evidence that Goodwin conducted an adequate investigation. *Cf. Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) (holding counsel had not rendered inadequate assistance where "[d]efense counsel had been prepared to present a mitigation case" and Jeffries decided against presenting such a case "after a weekend of discussions with his brother and with counsel").

In sum, we conclude that Stankewitz has alleged facts that, if true, would establish that Goodwin was ineffective for failing to investigate and uncover the important mitigating evidence outlined above. Moreover, Stankewitz's purported opposition to such testimony does not excuse Goodwin's performance, as Goodwin had a duty to investigate what evidence potentially could have been presented and discuss this evidence with Stankewitz in order to obtain an informed and knowing waiver.

### III. Prejudice

Having considered Goodwin's competence, we now turn to the issue of preju-

dice. To establish prejudice, Stankewitz must demonstrate a reasonable probability that, but for Goodwin's deficiency, he would not have been sentenced to death.[10] *See Wiggins*, 123 S.Ct. at 2542–44. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 2542; *see also Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.2001) (holding that ineffective assistance of counsel claims must be examined in light of the prosecutor's case).

Here, Stankewitz has alleged mitigating facts that might well have rebalanced the scale against death for some jurors. As discussed above, Stankewitz experienced an excess of privation and abuse as a child. His mother beat him so badly that she was jailed and he was taken away from her. Once in the care of the state, Stankewitz was abused, drugged and left to fend for himself. At the time he left Napa Hospital, Stankewitz was yet unable to use eating utensils or engage in the most rudimentary of social graces. He continued to wet his bed and smear feces on the wall of his bedroom. Stankewitz also suffered from organic brain damage, to the point of being borderline mentally retarded. These facts constitute "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 123 S.Ct. at 2542 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (" '[E]vidence about the defendant's

background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse.' ")); *see also Ainsworth v. Woodford*, 268 F.3d 868, 875 (9th Cir.2001) (holding that available evidence would have provided the jury insight into the defendant's troubled childhood, history of substance abuse and mental and emotional problems).

On the aggravating side of the scale, the prosecution presented many incidents of Stankewitz's violent and criminal behavior. As discussed in greater detail above, the jury heard testimony regarding the robbery of and attack on George Key; the shootout with Officer Reid; the attack of a counselor at the California Youth Authority; the robbery and kidnapping of Jesus Meraz; the stabbing of fellow inmate Carl Hogan; an attack on several police officers who were attempting to book Stankewitz; and various infractions while Stankewitz was in jail. Despite such evidence regarding serious and numerous incidents, however, the Supreme Court has made clear that counsel's failure to present mitigating evidence can be prejudicial even when the defendant's actions are egregious. The defendant in *Williams*, for example, was convicted of murdering an elderly gentleman and had committed various assaults and thefts, including "brutally assault[ing]

---

**10.** Where a defendant insists that mitigating evidence not be presented and his attorney adheres to that insistence, we analyze prejudice in terms of whether the additional evidence that counsel would have discovered through a proper investigation would have changed the defendant's mind. *E.g., Hayes v. Woodford*, 301 F.3d 1054, 1070 (9th Cir. 2002); *Landrigan v. Stewart*, 272 F.3d 1221, 1228 (9th Cir.2001). But we have held this prejudice analysis to be inapplicable where

counsel "actually disregarded his client's wishes and did put on what mitigating evidence he had unearthed." *Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir.2003). Thus, even assuming that Stankewitz objected to the presentation of mitigating evidence—a fact not clear from the record—because Goodwin did put on the little evidence he unearthed, the correct prejudice inquiry looks to whether the additional evidence could have affected the outcome of the case.

an elderly woman," leaving her in a "vegetative state." 529 U.S. at 368, 120 S.Ct. 1495. Even applying the strict AEDPA standards not applicable here, the Supreme Court held that Williams' counsel was prejudicially deficient because "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398, 120 S.Ct. 1495 (citing *Boyde v. California*, 494 U.S. 370, 387, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

It is true that Goodwin did not completely fail to present mitigating evidence, thus differentiating this case from *Wiggins*, where the attorneys presented practically no background testimony. *See Wiggins*, 123 S.Ct. at 2532 (testimony consisted of evidence that someone other than Wiggins committed the murder, but involved "no evidence of Wiggins' life history").[11] Indeed, the California Supreme Court concluded that Walden's testimony, combined with that of Theresa Montgomery and Jean Shacklett, obviated Stankewitz's ineffective assistance of counsel claim. *Stankewitz II*, 51 Cal.3d at 115–16, 270 Cal. Rptr. 817, 793 P.2d 23. We have held, however, that a defendant was prejudiced when, "[a]lthough [counsel] introduced some of [the defendant's] social history, he did so in a cursory manner that was not particularly useful or compelling." *Douglas*, 316 F.3d at 1090; *see also Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998) (considering that "numerous" mitigating factors "were reported to the jury only in the vaguest of terms" in concluding that confidence in the outcome was undermined as a result of counsel's failure to present mitigating evidence).

Counsel in *Douglas* presented witnesses who testified that "Douglas had been orphaned and had a difficult childhood .... was very poor growing up and always kept large quantities of food in his home, apparently as a result of childhood deprivation." *Douglas*, 316 F.3d at 1087–88. Counsel neglected to investigate and present evidence of the extent of Douglas' childhood deprivation, redeeming qualities, alcohol abuse and possible brain damage. *Id.* at 1088–89. This case is analogous. Walden, Goodwin's key witness in mitigation, met Stankewitz once when Stankewitz was six years old and affirms that Goodwin did nothing to prepare him to testify. A more complete presentation, including even a fraction of the details Stankewitz now alleges, could have made a difference. A more detailed examination of Stankewitz's life certainly would have foreclosed the prosecution's arguments in closing that Stankewitz was placed in a fit foster home, that "[w]e don't have any evidence" that Stankewitz "had to raise himself" and that there was not "anything organically wrong with" Stankewitz.

Not only could additional mitigating evidence have fostered sympathy for Stankewitz, it also could have diminished the aggravating impact of the prosecution's evidence. For example, by properly cross-examining Officer Reid, Goodwin might have undercut the prosecutor's damaging argument that Stankewitz had shot a police officer.

Finally, notwithstanding Goodwin's paltry mitigating evidence presentation, the record reveals that Stankewitz's jury did not regard a death sentence as "a foregone conclusion." *Silva*, 279 F.3d at 849–50 (weighing jury's question regarding the meaning of life without parole and juror's later recollection that "at least some of the

---

**11.** By contrast, in *Williams*, counsel introduced some mitigating evidence, but nothing

about Williams' difficult life. 529 U.S. at 369, 120 S.Ct. 1495.

jurors were initially leaning towards a verdict of life without parole" as evidence that petitioner was prejudiced by counsel's failure to investigate and present mitigating evidence); cf. Bean, 163 F.3d at 1081 (considering fact that jury was initially divided and deadlocked as evidence of prejudice arising from counsel's failure to present mitigating evidence). During deliberations on October 5, 1983, the jury asked the court "if anyone sentenced to confinement in a state prison for life without possibility of parole has been put before a parole board?"[12] . Several jurors had voted for life on the first vote, and the issue of what life in prison meant arose as the jurors deliberated after that first vote. One juror said that before they asked the question, "I think there were more people looking at life," and that "[l]ife really would have been an option, if we had known there was not a chance of him getting out." Another juror noted that there had been one hold-out and that it required "extensive deliberation" to convince her to vote for death.

Although the prosecution presented a strong case, we conclude that there was a reasonable probability that the jury would not have sentenced Stankewitz to death had it been presented with the evidence of the numerous deprivations and abuses Stankewitz alleges that he suffered for most of the 19 years he lived prior to the killing. Instead, it heard only general comments about the pervasive influence of drugs and alcohol on Indian reservations and a cursory sketch of Stankewitz's history of institutionalization. Had the jury been able to place Stankewitz's life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. See Wiggins, 123 S.Ct. at 2543.

## IV. Evidentiary Hearing

In light of the substantial mitigating evidence that Stankewitz has identified, his penalty phase ineffective assistance claim is certainly "colorable." Because the record before us, read in light of Wiggins and Williams, suggests that Stankewitz's counsel was unconstitutionally ineffective during the penalty phase and, if so, this ineffectiveness may have prejudiced Stankewitz, we conclude that the district court abused its discretion in denying Stankewitz's request for an evidentiary hearing. See Siripongs v. Calderon, 35 F.3d 1308, 1310 (9th Cir.1994) ("In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court."). At the evidentiary hearing, the state will have the opportunity to challenge Stankewitz's allegations. Stankewitz, of course, may further substantiate the allegations he has made. This panel will retain jurisdiction over any future appeal.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED for further proceedings consistent with this opinion.**

---

12. After discussion with counsel, the court advised: "The jury was instructed on the applicable law and should not consider or speculate on matters of law on which they were not instructed and in arriving at a verdict of life in prison without possibility of parole or death." The next morning, the jury returned a death verdict.