**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KRISTIN ROSSUM,
      *Petitioner-Appellant,*

v.

DEBORAH L. PATRICK, Warden;
EDMUND G. BROWN, JR., Attorney
General for the State of California,
      *Respondents-Appellees.*

No. 09-55666

D.C. No.
3:07-cv-01590-JLS-
JMA

ORDER AND
OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted
April 6, 2010—Pasadena, California

Filed September 13, 2011

Before: Dorothy W. Nelson and Stephen Reinhardt,
Circuit Judges, and Nancy Gertner, District Judge.*

Per Curiam Opinion;
Dissent by Judge Gertner

*The Honorable Nancy Gertner, District Judge for the U.S. District Court for Massachusetts, Boston, sitting by designation. Judge Gertner submitted her dissent for filing prior to her September 1, 2011 resignation from the court.

17393

**COUNSEL**

William J. Genego, Nasatir, Hirsch, Podberesky & Genego, Santa Monica, California, for the petitioner-appellant.

Edmund G. Brown Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Kevin Vienna, Supervising Deputy Attorney General, Kyle Niki Shaffer, Deputy Attorney General, San Diego, California, for the respondent-appellee.

**ORDER**

Respondents' petition for panel rehearing is hereby granted. The opinion filed on September 23, 2010, and published at 622 F.3d 1262 (9th Cir. 2010), is withdrawn and replaced by the attached opinion.

No new petitions for panel rehearing shall be accepted in this case.

## OPINION

PER CURIAM:

We conclude that this case is now controlled by the Supreme Court's intervening decision in *Harrington v. Richter*, 562 U.S. \_\_\_, 131 S.Ct. 770 (2011). Accordingly, we affirm the district court's denial of Kristin Rossum's petition for a writ of habeas corpus.

**AFFIRMED.**

GERTNER, District Judge, dissenting:

I respectfully dissent. While I appreciate the extent to which the Supreme Court's decisions in *Harrington v. Richter*, 562 U.S. \_\_\_, 131 S. Ct. 770 (2011), and *Cullen v. Pinholster*, 563 U.S. \_\_\_, 131 S. Ct. 1388 (2011) require that we rehear this case and reconsider the panel's original decision, I nevertheless find that our original conclusions — reversing and remanding the case for an evidentiary hearing on both prongs of *Strickland v. Washington*, 466 U.S. 668 (1984) — were entirely appropriate. The substantive finding of a *Strickland* violation in this case fits squarely within the rule of *Richter*; the relief ordered—an evidentiary hearing—fits within the requirements of *Pinholster*.

Kristin Rossum ("Rossum") was convicted of murdering her husband, Gregory de Villers ("de Villers"). The prosecution's theory was that Rossum poisoned him using fentanyl, a powerful synthetic opiate. Her conviction was upheld on

direct review at all levels. After the final denial of relief, Rossum, represented by new counsel, filed a habeas petition before the California Supreme Court, raising the same issues as the instant petition, presenting the same expert declaration and seeking the same relief, an evidentiary hearing. It was summarily denied. The federal district court, adopting the recommendations of the magistrate judge, followed suit, rejecting Rossum's petition.

In *Rossum v. Patrick*, 622 F.3d 1262 (9th Cir. 2010) (withdrawn), we reversed. Since the state habeas decision was a summary denial, we reviewed the decision *de novo*. Based on the four corners of the state trial and habeas record, we found that Rossum had made a strong showing that her lawyer's performance was deficient under the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), and that the state court's contrary determination was unreasonable. We remanded for an evidentiary hearing, focused on the question of whether Rossum was prejudiced by counsel's deficient performance. Respondent moved for a rehearing initially on the scope of the remand, but subsequently, based on *Richter* and *Pinholster*.

The case against Rossum hinged in large measure on toxicological and medical evidence which was equivocal. The fentanyl levels in de Villers's autopsy samples were extraordinarily, even unnaturally, high. And while these elevated levels suggested that death was immediate, they were at odds with medical evidence which indicated that de Villers lingered for several hours before he died. There was also a plausible alternative theory of death, accidental overdose of cold medicines and oxycodone. A conceded lapse in the chain of custody of de Villers's autopsy specimens raised the not insubstantial chance of contamination, that is, that the fentanyl was added to the samples after de Villers's death. Both Rossum and her lover worked at the San Diego County Office of the Medical Examiner (OME), which ordinarily would have performed the toxicological analysis. While the OME was sufficiently concerned about the possibility of a conflict of interest to send the

samples to another lab for testing, they were stored in an unsecured refrigerator at the OME for thirty-six hours. In addition to opportunity, there was motive to contaminate because of the various personal relationships among the OME's employees.

Under the circumstances, the failure of Rossum's attorneys to have de Villers's autopsy samples tested for fentanyl metabolites, a test that would have resolved whether de Villers had in fact ingested fentanyl or whether fentanyl found in the samples was a product of laboratory contamination subsequent to his death, could have been critical. Rather than investigating this possibility, Rossum's counsel conceded that the cause of death was fentanyl; the defense theory was suicide-by-fentanyl, which was implausible in the light of the toxicological evidence. If testing indicated that the fentanyl found in the samples had never been in de Villers's body, the prosecution's theory that fentanyl was the cause of death would have been proven wrong.

The panel remanded the case to the district court to hold an evidentiary hearing. *Rossum*, 622 F. 3d at 1275-76. The *state trial record* was inadequate to decide the *Strickland* question precisely because trial counsel failed to develop the evidence outlined in Rossum's state Supreme Court habeas petition. And the *state habeas* record was likewise inadequate because it only provided the one sided conclusions of petitioner's fentanyl expert in affidavit form. Without a hearing it was necessarily untested by cross examination or the evidence of a competing expert.

Indeed, the respondent's initial Petition for Rehearing of the panel decision underscored the importance of holding an evidentiary in a case such as the one at bar. Respondents reasonably wanted to make certain that they would be permitted to call witnesses to counter the petitioner's expert's declaration, and to cross examine the declarant. In addition, they sought to present evidence challenging counsel's alleged defi-

cient performance (*Strickland*'s first prong) as well as show that petitioner was not prejudiced by counsel's alleged ineffectiveness (*Strickland*'s second prong).

Neither *Richter* nor *Pinholster* should change the panel's original conclusions. To be sure, *Richter* mandates deference even to the California Supreme Court's summary denial of the habeas petition. And deference means that we are to hypothesize the arguments that "could have been made to support the state court's decision," and then determine if "fair minded jurists could disagree" as to whether these arguments were unreasonable under federal law. *Richter*, 131 S. Ct. at 786. In addition, where the right at issue is ineffective assistance of counsel, habeas review is "doubly" deferential. *Id.* at 788. But even applying these standards, I conclude that no "fair minded jurist could disagree" that the arguments that could have been made in support of the state decision—particularly the decision to deny a hearing on these facts—were unreasonable under *Strickland. Richter*, 131 S. Ct. at 785-86.

*Richter* is wholly distinguishable by the substantial evidence in that case of the petitioner's guilt, as well as the plausible reasons for not pursuing the forensic testing on which the *Strickland* violation was premised. In contrast, in the case at bar, if the fentanyl metabolite test demonstrated the absence of metabolites in the autopsy samples, the government's theory of murder would have been demonstrably erroneous. On this record, I can conceive of no plausible reason for counsel to have not conducted the test.

And, while *Pinholster* narrowed the circumstances under which a federal court can order an evidentiary hearing, I believe that the instant case falls within those narrow circumstances. In *Pinholster*, the Court was concerned about a federal ruling based on facts no state court had had an opportunity to evaluate. The *Pinholster* majority did not address the situation here (although it was raised in the concurrence)—where the untested facts in the state habeas

record made out a strong showing of a *Strickland* violation, and the state's contrary determination was unreasonable. Under such circumstances, the critical question is whether those facts are true, precisely what an evidentiary hearing seeks to uncover and which the state court unreasonably denied.

It cannot be that a federal court is obliged to repeat the state court's error. Without a hearing both sides are disadvantaged. It would be unfair to the government to assume the truthfulness of the expert's untested declaration and order habeas relief. And, it would be equally unfair to Rossum to conclude that she is entitled to no relief in federal court in the face of a strong showing of a constitutional violation which the state court precluded her from developing. Nothing in *Pinholster* requires that result.

Accordingly, I would remand for an evidentiary hearing.

## *BACKGROUND*

### I.   *Factual Background*

I recite the facts in detail because they underscore the circumstantial nature of the case and the centrality of the forensic testing issue. Rossum and de Villers married in 1999. In 2000, Rossum was hired as a toxicologist at the OME. Around the time of her hiring, the OME appointed Michael Robertson to the position of Forensic Laboratory Manager. Robertson, a new hire, replaced Russ Lowe, a longtime employee who had been serving as acting laboratory manager.

Rossum and Robertson—who, like Rossum, was married at the time—began having an affair. Lowe and OME toxicologist Catherine Hamm testified that some of Rossum's coworkers resented her for it, believing that she might receive special treatment from Robertson, who was her supervisor.

On Thursday, November 2, 2000, de Villers confronted Rossum about his suspicion that she was using drugs (she had abused methamphetamines in college), and worse, that she was having an affair with Robertson. He threatened that if she did not resign, he would reveal both her drug use and her affair.

Rossum testified that when de Villers awoke on the morning of Monday, November 6, he seemed "out of it." At 7:42 a.m., she left a message at his workplace stating that he was ill and probably would not come to work that day. Rossum went to work soon thereafter; coworkers saw her crying in Robertson's office. That afternoon, she went back and forth from her work to her apartment. At midday, according to Rossum, she ate lunch with her husband. When she asked him why he had been so "out of it" that morning, he told her that he had taken some of her oxycodone and clonazepam, which she had obtained years earlier when she was trying to end her methamphetamine addiction. According to Rossum, de Villers went back to bed after lunch, and she returned to work.

Rossum left work at 2:30 p.m. and stayed with Robertson until about 5:00 p.m., when she went back to her apartment, leaving again at 6:30 p.m. to run errands. Upon her return at about 8:00 p.m., de Villers appeared to be sleeping. After a bath and shower, she found that de Villers was not breathing.

Rossum called 911 at 9:22 p.m. The operator instructed her to move de Villers's body to the floor and attempt CPR. When paramedics arrived, they found his body on the floor with red rose petals strewn around him.[1] Rossum initially told the paramedics that he had not taken any drugs as far as she knew, but later told them that he may have taken oxycodone.

---

[1]The parties disputed the source of the rose at trial. *See Rossum*, 622 F.3d at 1266 n.2.

De Villers was pronounced dead at 10:19 p.m. While at the hospital, Rossum told a nurse that de Villers may have overdosed on oxycodone.

Dr. Brian Blackbourne, the San Diego County Medical Examiner, who performed de Villers's autopsy, determined that de Villers had been dead for at least an hour before the paramedics arrived. He concluded that de Villers had developed early bronchopneumonia, a condition that results when secretions that are normally removed by the breathing process accumulate in the lungs because the person is "unconscious or not breathing very deeply." He also noted that de Villers had a substantial amount of urine in his bladder, an amount which would have been "very uncomfortable" to a conscious person. The combination of the two—the bronchopneumonia in de Villers's lungs and the amount of urine in his bladder—led Dr. Blackbourne to conclude that de Villers had been not breathing properly for approximately six to twelve hours prior to his death.

Lloyd Amborn, the OME's operations administrator, decided to send the autopsy samples to an outside laboratory to avoid any potential conflict of interest; this was the first time that he ordered an outside lab to conduct such tests. The specimens were placed in a cardboard box, with each container marked as a sample taken from de Villers's body. They were supposed to be transported to the sheriff's office for transfer to the outside lab, but, since the individual who was to receive the samples was not immediately available, the box was taken to the OME. It remained in an OME refrigerator for approximately thirty-six hours until it was taken to the sheriff's crime lab on the morning of Thursday, November 9, 2000.

While the autopsy specimens were at the OME, anyone with a key to the building had access to them. The containers were not sealed; their tops could be pulled off and then replaced. Indeed, on Wednesday, November 8, 2000, Robert-

son commented to one of the toxicologists at the OME that he had looked at a sample of de Villers's stomach contents.

That same day, November 8, Russ Lowe—the veteran OME employee who served as acting laboratory manager before Robertson supplanted him—called the police to report Rossum's and Robertson's affair. Lowe's call was a turning point in the investigation, focusing the police's attention on the possibility of foul play.

Toxicology tests showed that de Villers's autopsy specimens contained extraordinarily high concentrations of fentanyl, as well as a smaller amount of clonazepam and a trace level of oxycodone. Dr. Blackbourne characterized the concentration of clonazepam found in de Villers's blood as a high therapeutic level, but not at the level of an overdose and "not fatal." He conceded, however, that sometimes postmortem testing reveals a lower concentration of a drug than had previously been present in the body. The jury also heard testimony that oxycodone, which is an opiate, and clonazepam, a benzodiazepine, can have a "synergistic" effect on each other, meaning that each drug is made more powerful when taken with the other.

The discovery of fentanyl in de Villers's samples was unexpected; the OME did not ordinarily test for it; Pacific Toxicology, the outside laboratory to which the samples were first sent, did so regularly. After receiving the test results, Dr. Blackbourne concluded that de Villers died of acute fentanyl intoxication.

Prior to Rossum's trial, de Villers's samples were also sent to two other laboratories for testing: the Alberta Office of the Chief Medical Examiner in Canada and Associated Pathologist Laboratories in Las Vegas, Nevada. As the following chart demonstrates, the concentration levels of fentanyl measured by the different laboratories varied:

|                                              | Alberta Office of the Chief Medical Examiner | Pacific Toxicology Laboratories | Associated Pathologist Laboratories |
| -------------------------------------------- | -------------------------------------------- | ------------------------------- | ----------------------------------- |
| Stomach Contents                             | 201 ng/mL, 210 ng/mL                         | 286.5 ng/mL, 329.7 ng/mL        | 128 ng/mL                           |
| Urine                                        | —                                            | 189 ng/mL                       | 236 ng/mL                           |
| Blood                                        | —                                            | 57.3 ng/mL                      | 32.8 ng/mL                          |
| Peripheral Blood                             | —                                            | 11.2 ng/mL                      | —                                   |
| Antemortem Blood                             | —                                            | 35.8 ng/mL                      | —                                   |
| Right Proximal Forearm Ulnar Aspect Tissue   | —                                            | 21.3 g                          | —                                   |

*Key:* "g" is grams; "ng" is nanograms; "mL" is milliliters; "—" indicates that there are no results in the record

The prosecution called Dr. Theodore Stanley as an expert witness on fentanyl. Dr. Stanley testified that fentanyl is a potent and generally fast-acting pain reliever with a serious side effect; it can cause a person to stop breathing. Fentanyl begins to affect respiration at a concentration level in the blood of 2 ng/mL. At a concentration of 4 ng/mL, about half of "opioid naive" individuals—people without significant experience taking opiates—would be breathing very slowly or not at all. At 57.3 ng/mL, the extraordinarily high concentration found in de Villers's blood by Pacific Toxicology, no opioid naive individual would be conscious or breathing.[2]

Dr. Stanley testified that the speed with which fentanyl takes effect depends on the manner in which it is administered: the peak effect occurs about sixteen hours after administration of a transdermal patch, twenty to thirty minutes after oral consumption, fifteen to twenty minutes after intramuscu-

---

[2]No evidence was presented at trial that de Villers was inured to the effects of fentanyl through the regular abuse of opiates.

lar injection, and five minutes after intravenous injection. He explained that fentanyl is not normally administered orally because when the drug is taken in this way, the liver destroys about 65 percent of it, leaving only about 35 percent to enter the bloodstream.

None of the three physicians who testified at Rossum's trial —Dr. Blackbourne, Dr. Stanley, or the defense expert on fentanyl, Dr. Mark Wallace—could provide a definitive opinion as to how the fentanyl was introduced into de Villers's body. Dr. Stanley, however, testified that the differing concentration levels in de Villers's system, along with the evidence indicating that de Villers had been unconscious and breathing shallowly for hours before his death, suggested that fentanyl likely had been administered to de Villers on multiple occasions.

After de Villers's death, the OME audited its impounded drugs and drug standards.[3] It discovered that fifteen fentanyl patches and ten milligrams of fentanyl standard were missing. Rossum had logged in the fentanyl standard and had worked on each of the three cases in which the missing fentanyl patches had been impounded. The OME also determined that quantities of methamphetamine, clonazepam, and oxycontin (a time-released form of oxycodone) were missing.

## II.  Rossum's Trial and Post-Trial Proceedings

Rossum was prosecuted for de Villers's murder. Cal. Penal Code §§ 187, 190.2(a)(19). The prosecution's theory was that Rossum poisoned de Villers with fentanyl, possibly after the clonazepam she gave him failed to kill him. The defense conceded that fentanyl caused de Villers's death but contended that de Villers committed suicide because he was despondent over his marital problems.

---

[3]The OME impounds drugs discovered at the scene of an individual's death and maintains an inventory of "drug standards"—quantities of particular drugs used as reference material during testing procedures.

The jury found Rossum guilty; the court sentenced her to prison for life without parole. All reviews failed.

On December 15, 2006, Rossum, represented by new counsel, filed a petition for a writ of habeas corpus in the California Supreme Court.[4] The petition asserted for the first time the claim at issue in this proceeding—that Rossum's trial counsel rendered ineffective assistance by not having de Villers's autopsy samples tested for fentanyl metabolites despite the fact that if metabolites were not found in the sample, the results would have ruled out fentanyl as the cause of de Villers's death and disproven the prosecution's theory. Rossum offered a declaration from Dr. Steven H. Richeimer, a physician with substantial experience in anesthesiology, and requested an evidentiary hearing. Dr. Richeimer's declaration underscored the anomalous nature of the evidence in the light of fentanyl's properties as "a very rapidly acting drug." On the one hand, "[i]f very high doses [were] rapidly administered" to de Villers, then he likely would have died "within minutes," "not in a manner consistent with the 6-12 hours of impaired breathing and consciousness described by Dr. Blackbourne." On the other hand, if de Villers absorbed fentanyl "gradually, perhaps through the stomach," then he likely would not have survived "long enough for [his] blood levels to reach the extremely high levels" measured by the toxicology labs.

According to Dr. Richeimer, contamination of the samples drawn from de Villers's body would have explained the seeming "inconsistency between the rapid action of fentanyl, the extraordinarily high concentration levels, and the lengthy period of impaired breathing and reduced consciousness" that de Villers suffered. Indeed, Dr. Richeimer opines:

---

[4]In California, the state supreme court, intermediate courts of appeal and superior courts all have original habeas corpus jurisdiction. *See* Cal. Const. art. VI, § 10.

> [C]ontamination of the specimens would explain the high blood levels better than ingestion or other administration of fentanyl to the decedent. . . . [I]n attempting to determine if the cause of death was from fentanyl, it would be necessary to rule out the possibility that the samples were contaminated.

Richeimer Decl. at 3.

Dr. Richeimer further noted that a toxicology lab could conclusively resolve the contamination issue by testing his samples for metabolites of fentanyl. If de Villers's specimens contain metabolites of fentanyl, then fentanyl must have been present in his body at the time the specimens were taken. If no metabolites are present, then the specimens must have been contaminated after his death.

The California Supreme Court summarily denied Rossum's habeas petition in a one-sentence order on August 8, 2007. Two days later, Rossum filed a federal habeas petition under 28 U.S.C. § 2254. The district court adopted the recommendation of the magistrate judge and denied Rossum's petition. It also denied Rossum's motion, made under Rule 6 of the Rules Governing Section 2254 Cases, for leave to test de Villers's autopsy specimens for metabolites of fentanyl.

## *DISCUSSION*

### I. *Governing Legal Standards*

Review of the instant petition is framed by Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), and upon rehearing, by the Supreme Court's recent decisions in *Richter* and *Pinholster.*

### A. *Richter*

Under AEDPA, the district court could not grant Rossum's habeas relief unless the California Supreme Court's decision

denying her state habeas petition "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Reynoso*, 462 F.3d at 1109. Under *Richter*, even if the state court's decision is unaccompanied by an explanation, § 2254(d) still requires that federal court to hypothesize what arguments *could have* supported the state court's decision and then ask if "fair-minded jurists could disagree that those arguments . . . are inconsistent with the holding in a prior decision" of the Supreme Court. *Richter*, 131 S. Ct. at 784-86.

*Richter* also emphasized the interplay between AEDPA's deferential review and the deference accorded trial counsel in an ineffective assistance claim. Under *Strickland*, Rossum must prove that (1) her counsel's performance was deficient, and (2) she suffered prejudice as a result. 466 U.S. at 687. To be deficient, an attorney's conduct must fall below an "objective standard of reasonableness" established by "prevailing professional norms." *Id.* at 687-88. To demonstrate prejudice, Rossum must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Under AEDPA, we may not merely reverse the state court finding that there are no *Strickland* violations, but we must conclude that that determination is itself unreasonable. *Id.* at 788. *Strickland* presupposes that there is a "wide range" of reasonable professional assistance which meets the constitutional standard. *Richter* at 787. As such, the application of AEDPA's standards to ineffective assistance of counsel claims is "doubly" deferential. *Id.* at 788. In effect, trial counsel is given a wide berth under *Strickland* as in addition are state courts under AEDPA.

I will first address the arguments that could have been made to support the California Supreme Court's decision, and then consider whether their acceptance by that Court represents an unreasonable application of *Strickland*. In considering the latter, I evaluate not only whether the state court was

unreasonable in its ultimate conclusion that there was no *Strickland* violation, but also in its conclusion that Rossum had not made an adequate showing for an evidentiary hearing in state court. Then I will consider what remedy is appropriate.

## B.   *The Merits of Rossum's* Strickland *Claim*

Rossum argued that a competent attorney would not have conceded that fentanyl caused de Villers's death without first having his autopsy specimens tested for metabolites of fentanyl. The California Supreme Court, in considering Rossum's habeas petition, asked itself "whether, assuming the petitioner's factual allegations [were] true, the petitioner would be entitled to relief." *People v. Duvall*, 9 Cal. 4th 464, 474 (1995). The court's summary denial of Rossum's petition without issuing an order to show cause or holding an evidentiary hearing reflected its determination that "the claims made in the petition [did] not state a prima facie case entitling the petitioner to relief." *In re Clark*, 5 Cal. 4th 750, 770 (1993). The question is whether, under § 2254(d)(1), given the facts alleged by Rossum before the state court, the court's summary rejection of her claims was, in light of the entire state court record, an unreasonable application of federal law. *See Pinholster*, 131 S. Ct. at 1403 n.12.

Clearly, the state's decision was an unreasonable application of federal law. There were "tantalizing indications" in the state court record that de Villers's autopsy specimens might have been contaminated: The medical and toxicological evidence raised serious questions as to whether fentanyl could have caused de Villers's death, an alternative cause of death was plausible, and there was a lapse in the chain of custody of de Villers's autopsy specimens. *Stankewitz v. Woodford*, 365 F.3d 706, 719-20 (9th Cir. 2004). Furthermore, given the significance of the test to this case, counsel could not show any strategic reason for his failure to have the samples tested. Proving that there were no metabolites would render the pros-

ecution's theory untenable. Proving that there were metabolites would be wholly consistent with the theory the defense adopted in the absence of such proof and to the facts to which it stipulated. Thus there could be no possible harm to Rossum as a result of the performance of the metabolite test.[5] Accordingly, any state court determination to the contrary, particularly without an evidentiary hearing, would have constituted an unreasonable application of *Strickland.*

Five arguments could have been made in support of the California Supreme Court's decision. First, Rossum's counsel's decision not to challenge the evidence that fentanyl caused the victim's death was a reasonable exercise of trial strategy in light of the overwhelming evidence of fentanyl poisoning. Second, defense counsel's failure to pursue a contamination theory was not unreasonable because the contamination theory was too speculative. Third, it was reasonable for defense counsel to concede the cause of death and decline to pursue a contamination theory because those arguments would have been contradicted by Rossum's testimony that she believed her husband had died as a result of his voluntary ingestion of fentanyl and other drugs. Fourth, the facts of *Richter* closely track the case at bar and, as the Supreme Court found, do not warrant relief. Finally, even if counsel's performance were deficient, Rossum cannot show prejudice.

1.   Overwhelming Evidence

The evidence of fentanyl poisoning as the cause of death was not overwhelming, and thus this explanation for defense counsel's conduct could not have served as a reasonable basis for the California Supreme Court's decision that Rossum had not established that her counsel's performance was constitu-

---

[5]Only if the defense intended to offer the results into evidence at trial, which they would do if they were negative, would there be a duty to disclose. *See* Cal. Penal Code § 1054.3(a) (West 2002); *see also Rossum*, 622 F.3d at 1274.

tionally deficient. The fentanyl concentration levels measured by the three toxicology labs were widely disparate, and extraordinarily high, suggesting that something might have been amiss with de Villers's autopsy specimens. Dr. Stanley conceded that in his decades of experience, he had never seen fentanyl concentrations as high as those measured in de Villers's stomach. Given fentanyl's potency, a competent attorney would have wondered how the concentration of fentanyl in de Villers's blood, urine, and stomach contents could have reached these levels before the drug killed him.[6]

The record also raises question as to how de Villers could have lingered for six to twelve hours before finally succumbing. Dr. Richeimer's declaration reflected that if Rossum administered a single, large dose of fentanyl to de Villers, he would have died within a matter of minutes. If de Villers absorbed fentanyl gradually, his breathing would have stopped; he would have perished long before the concentration of fentanyl in his blood reached the stratospheric levels measured by the toxicology labs.[7] The inconsistency between fentanyl's potency and its relatively rapid onset, on the one hand, and de Villers prolonged period of unconsciousness and his extraordinarily high toxicology results, on the other, would have prompted a competent attorney to investigate the possibility that de Villers's death was caused by something else.

There was an alternative explanation of de Villers's death, although one that was not fully developed once the high fenta-

---

[6]There is some evidence suggesting that fentanyl has a unique property: unlike most drugs, concentrations of fentanyl may increase after death, but not enough to explain the extraordinarily high levels found in the samples. *See Rossum*, 622 F. 3d at 1270 n.7.

[7]Dr. Stanley did testify that de Villers's blood levels potentially could have been obtained through the application of multiple transdermal patches. But his opinion on this issue was very tentative. He admitted that he was "not sure" that such levels could be achieved because he had never placed that many patches on a patient.

nyl levels were found. Toxicologists also found clonazepam and oxycodone in de Villers's autopsy specimens. True, the concentration of clonazepam was in the high therapeutic range, not fatal, and only a trace amount of oxycodone was found. But Dr. Stanley testified to the synergistic effect of clonazepam and oxycodone, each multiplying the effect of the other when they are taken in combination. Thus, a concentration of clonazepam near the top of the therapeutic range could potentially have turned lethal when its effect was compounded by the presence of oxycodone. In addition, Dr. Blackbourne conceded that the concentration of clonazepam in de Villers's body might have fallen after his death due to postmortem redistribution.

2.   Contamination

The possibility of contamination was not too speculative, and therefore could not reasonably justify the California Supreme Court's rejection of Rossum's petition. The samples were stored at the OME lab for thirty-six hours before they were transferred to the sheriff's office. Anyone with a key to the OME had access to them. (Indeed, Robertson claimed to have opened at least one of the samples while they were housed at the OME.) Since the OME also stores fentanyl at its lab, contamination—whether intentional or unintentional—could have occurred.

The samples could have been contaminated by a coworker upset by the preferential treatment Rossum seemed to receive from Robertson. Alternatively, an OME employee seeking to dethrone Robertson from his position as laboratory manager could have contaminated the specimens to cast suspicion on both him and Rossum.[8]

---

[8]Robertson appears to have had a special interest and expertise in fentanyl. Russ Lowe testified that he discovered approximately thirty-seven articles on fentanyl while cleaning out Robertson's office after his departure from the OME. If Robertson's interest in fentanyl was widely known, then contaminating de Villers's samples with fentanyl might have seemed like an effective way of implicating Robertson in de Villers's death.

Respondent further claims that because toxicology labs rarely test for fentanyl, if one of Rossum's coworkers was trying to frame her or Robertson, he would not have used fentanyl. The trial record suggests otherwise. OME employees could well have known that de Villers's specimens would be sent to an outside lab, and that the first lab selected to analyze de Villers's samples, Pacific Toxicology, did test for fentanyl. Moreover, the argument ignores the manner in which toxicology testing is ordinarily done. Dr. Blackbourne testified that if a toxicology lab's initial testing fails to disclose a cause of death, further tests are often conducted to determine if less common substances—like fentanyl—are present.

In any event, contamination could have been definitively determined through testing for the presence of metabolites of fentanyl, according to Dr. Richeimer's declaration.[9] Although the Respondent notes that the absence of fentanyl metabolites would not have exonerated Rossum because she could have killed de Villers with another drug, it is highly unlikely that

---

[9]Respondent argued at the District Court that "Petitioner presents no evidence that the autopsy specimens were not already tested for the presence of metabolites," and quoted directly from Dr. Richeimer's declaration, "testing for these metabolites is commonly done by many laboratories." Answer to Pet. for Writ of Habeas Corpus 15. At oral argument, however, Respondent instead claimed that a competent attorney would not have realized that de Villers's samples could be tested for contamination by analyzing them for the presence of fentanyl metabolites. Respondent directed our attention to the cross-examination of toxicologist Michael Henson. Rossum's attorney asked Henson, "Do you have any way of knowing or testing to determine if any [of de Villers's] samples . . . has been tampered with or spiked by anybody?" Henson answered, "No." ER 305. An answer given by a single prosecution witness during cross-examination cannot, however, be dispositive, particularly given Rossum's allegation in her state habeas petition that her trial counsel "could have determined the viability of a contamination defense by having the specimens confidentially tested." State Habeas Petition at 4, *see also id.* at 30. In any case, defense attorneys are obligated to pursue lines of investigation that hold out the promise of proving their clients' innocence prior to deciding on a trial strategy. *See Hart v. Gomez*, 174 F.3d 1067, 1070-71 (9th Cir. 1999).

a jury would have convicted her if the defense were able to conclusively contradict the prosecution's only theory, that fentanyl was the cause of death. In any event, if fentanyl metabolites *were* found, the defense would have suffered no harm; it could proceed just as readily as before with its unsuccessful suicide-by-fentanyl theory.

3.    Suicide Defense

The state court may have relied on Respondent's argument that Rossum's attorneys could reasonably have decided not to pursue a contamination theory so as not to contradict Rossum's trial testimony. However, this could not have been the basis for counsel's decision not to pursue a contamination theory in the first instance. They had an obligation to investigate such a theory *before* the trial, when there was no testimony to contradict. In any event, this argument gives undue prominence to a single question and answer made during Rossum's cross-examination:

> Q. So it is your testimony, then, that Greg de Villers voluntarily took fentanyl, clonazepam, and oxyco-done, correct?
>
> A. As far as his death, yes.

Trial Tr. vol. 21, 2569.

Rossum's answer was nothing more than a restatement of her defense. She insisted that she did not have firsthand knowledge of how her husband died because de Villers, not she, administered whatever drugs caused his demise. She simply believed he had committed suicide by voluntarily taking the drugs that had been found in his system.

While there were significant holes in the prosecution's theory that Rossum murdered de Villers with fentanyl, the defense's suicide-by-fentanyl theory was even more implausi-

ble. The medical and toxicological evidence suggested that de Villers could only have died from an overdose of fentanyl if he was administered the drug on multiple occasions throughout the day. If de Villers self-administered a large, single dose of fentanyl, then he would have died too rapidly for the bronchopneumonia to develop in his lungs and for the large quantity of urine to collect in his bladder. But de Villers could not have voluntarily taken multiple doses of fentanyl over the course of the day because in the last hours of his life, he was too comatose even to breathe properly, much less self-administer fentanyl. In any event, administering the test for metabolites could have only proven the prosecution's case wrong; it could in no way have harmed the defendant's case.[10]

4.  Comparison with *Richter*

Respondent also attempts to draw factual parallels to *Richter*, where the Supreme Court found that it was reasonable for the state court to deny an ineffective assistance of counsel claim based on counsel's failure to conduct forensic testing. In contrast to Rossum's case, however, the failure to do forensic testing was not unreasonable in *Richter* because testing might have undermined the only plausible defense available to Richter, that the victim was killed in the cross fire of the co-defendant's shooting battle, and not at Richter's hands. 131 S.Ct. at 789-90. Furthermore, the Court found "sufficient conventional circumstantial evidence pointing to Richter's guilt." *Richter* at 792.

Rossum's case, in contrast, is about forensic testing that would have been dispositive on the cause of death. The state's case against Rossum pivoted entirely on the fentanyl finding. And unlike *Richter*, counsel's performance with regard to this test could not reflect competent legal strategy—at least on the record before the state court. By confidentially testing for fentanyl metabolites, counsel would have given up nothing.

---

[10]*See supra* note 6.

Notably, *Richter* acknowledges that there will be criminal cases where the "only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." 131 S. Ct. at 788. Indeed, the Third Circuit recently applied this principle in *Showers v. Beard*, 635 F. 3d 625 (3d. Cir. 2011), a post-*Richter* case, involving yet another murder case in which a woman was accused of killing her husband with liquid morphine, Roxanol. The government claimed the defendant administered the drug; the defense claimed that her husband committed suicide. At issue was whether the bitter taste of Roxanol could be masked. At an evidentiary hearing in the state court—this state court *granted* an evidentiary hearing— new experts testified that the taste could not be masked, and one of the experts who had testified at trial indicated he had informed the defense that he did not know one way or the other. What is significant in *Showers* is i) that the Court distinguished wholly circumstantial cases and in particular, cases involving forensic issues from others, and ii) the state record is far more complete precisely because it granted an evidentiary hearing. The terms on which the Court distinguished *Richter* apply precisely to the case at bar:

> The facts in *Richter* were radically different from the facts and circumstances here. The dissenting judge in the Pennsylvania Superior Court stated that "[t]he defining issue in this matter is whether the victim, who according to the Commonwealth's theory unknowingly ingested a toxic substance, Roxanol (liquid morphine), would have or could have done so without any evidence that the drug's acute bitterness was masked so as to conceal its presence." *Showers II*, 782 A.2d at 1023 (Tamilia, J., dissenting). The properties of Roxanol and the autopsy results were known well before the trial. If Roxanol could not be masked by another substance, the only plausible explanation for the manner of death would have been willing, selfadministration. *The Commonwealth's*

*evidence in the case against Showers, other than expert testimony regarding the properties of liquid morphine, was wholly circumstantial, making scientific evidence all the more important. See Duncan v. Ornoski,* 528 F.3d 1222, 1235 (9th Cir. 2008) ("It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field."). Dr. Doyle provided Showers' counsel with the names of three experts but counsel failed to consult even one of the three experts that Dr. Doyle had already suggested would have supported the defense's suicide theory.

635 F. 3d at 631 (Italics supplied.)

Like *Showers*, it was critical for counsel to address the forensic evidence and its substantial limitations in order to provide an effective assistance of counsel. And through that lens, I conclude that no fairminded jurist would disagree, based on the record before the state court, that it was unreasonable for defense counsel to pursue a suicide-by-fentanyl theory, with all its defects, without first having de Villers's specimens tested for metabolites.

5. Prejudice

The state court may have found that even if Dr. Richeimer's declarations were true, and Rossum's counsel was ineffective, she could not demonstrate prejudice under *Strickland*'s second prong. However, no fairminded jurist could find such a determination to be reasonable on this record. Rossum alleged in her state habeas petition that testing the samples would reveal that they contained no fentanyl metabolites. State Habeas Petition at 4. As noted, if the defense had tested de Villers's autopsy specimens and found no fentanyl metabolites, it could have refuted the prosecution's theory of murder by fentanyl overdose. And, given the evidence, the prosecution would have had a difficult time con-

vincing the jury that Rossum committed the murder with different drugs. Indeed, if jurors learned that de Villers's autopsy samples had been contaminated, either intentionally or by accident, they would in all likelihood have viewed the prosecution's evidence as falling short of that needed to meet the beyond a reasonable doubt standard.

Accordingly, I find that based on the state trial record and the evidence and factual allegations presented in Rossum's state habeas petition, including the Richeimer declaration, the state court's summary rejection of her ineffective assistance of counsel claim was an unreasonable application of the Supreme Court's decision in *Strickland.* An evidentiary hearing is necessary—as the Respondent suggested in the rehearing petition—to permit the state an opportunity to question Dr. Richeimer regarding the contents of his declaration. I also find that an evidentiary hearing is necessary to provide the petitioner with the opportunity to prove prejudice by testing de Villers's autopsy samples to determine whether they contain fentanyl metabolites, an opportunity of which the state deprived Rossum by denying her a habeas hearing.

I turn now to the question of whether the Supreme Court's decision in *Pinholster* precludes such a hearing.

C. *Pinholster*

In *Pinholster*, the Court found that review under § 2254(d)(l) is "limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398. The *Pinholster* majority was concerned that AEDPA's scheme, a scheme intended to leave primary responsibility for evaluating state convictions with state courts, would be undermined were a petitioner permitted to overcome an "adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively, *de novo.*" 131 S. Ct. at 1399. Thus, Respondent argues that, on the authority of *Pinholster*, this court may not

order an evidentiary hearing. It asserts that if the state court trial and habeas record is not adequate to obtain habeas relief, Rossum's claim must fail. *Pinholster*, however, is distinguishable as a matter of fact, law, and logic.

Pinholster was convicted of murder; at the penalty phase, the jury unanimously voted for death. His first state habeas petition, prepared by new counsel, alleged *inter alia*, ineffective assistance of counsel at the penalty phase. He claimed that his trial counsel failed to present mitigating evidence, including evidence of his mental disorders. He offered various corroborative records, as well as factual declarations from family members, prior counsel and a psychiatrist. The California Court denied the claim. Pinholster then filed a federal habeas petition, reiterating his previous allegations, but adding new claims and significantly, new facts. The federal court held the petition in abeyance, to allow Pinholster to return to state court. The state court again denied the petition. Returning to federal court, Pinholster amended his petition, now on all fours with the second state petition, and asked for an evidentiary hearing. At the hearing, new medical experts testified for both sides, experts not presented to the state court at any time.[11] The district court granted habeas relief, and this Court, sitting en banc, affirmed. *Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009).

The Supreme Court reversed. In part II of the majority opinion, the Court held "that review under § 2254(d)(1)" must be limited to the facts presented to the state court; in part III, the Court concluded that, based on the state record, the state court's decision was not unreasonable. *Pinholster*, 131 S. Ct. at 1398-99.

Rossum has satisfied the requirements of *Pinholster*. She

---

[11]Indeed, the government claims that the evidence presented at the hearing was so different from that presented in state court as to amount to unadjudicated claims.

has demonstrated that the state court's rejection of her petition was unreasonable, and has done so on the basis of the record that was before the state court. *Pinholster* requires no more. I would now order an evidentiary hearing not to allow petitioner to "overcome the limitation of § 2254(d)(1)" using evidence not presented to the state court, *see id.* at 1400; rather, I would order the evidentiary hearing to determine whether, now that petitioner has demonstrated that the state court's summary decision, including its refusal to afford her a hearing, was unreasonable, a federal court may grant the relief that she requests. *Pinholster* did not hold that AEPDA bars a federal habeas court from *ever* holding an evidentiary hearing. Indeed, it recognized that "Section 2254(e)(2) [which governs evidentiary hearings] continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Id.* at 1401. In this case, because § 2254(d)(1) does not bar relief—Rossum has demonstrated on the basis of the state court record that the state court's decision was an unreasonable application of federal law—an evidentiary hearing is not precluded by *Pinholster*.

In his concurrence, Justice Breyer explained the effect of *Pinholster*'s interpretation of § 2254(d)(1) as follows:

> An offender who believes he is entitled to habeas relief must first present a claim (including his evidence) to the state courts. If the state courts reject the claim, then a federal habeas court may review that rejection on the basis of materials considered by the state court. If the federal habeas court finds that the state court decision fails [§ 2254](d)'s test . . . then a[ ] [§ 2254](e) hearing may be needed."

*Id.* at 1412 (Breyer, J., concurring in part and dissenting in part). In order to provide support for the majority's contention that its construction did not render § 2254(e) obsolete, Justice Breyer offered examples of situations in which a federal court

could properly hold an evidentiary hearing despite *Pinholster*. One such example applies precisely to the instant case:

> "[I]f the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true."

*Id.*

In the case at bar, I have reviewed the state court's rejection of petitioner's claims based on the record before it. The state court assumed the truth of petitioner's factual claims, but held that even if those facts were true, she had not established a viable *Strickland* claim. This determination was an unreasonable application of *Strickland*, and as such, Rossum has thus satisfied § 2254(d)(1)'s requirements. To the extent that the conclusions in the panel's original opinion were tentative it was precisely because the state habeas record was one sided —Rossum offered the declaration—and no evidentiary hearing had been ordered. Surely no court could make a definitive determination as to the petition itself without giving the state an opportunity to prove that the facts in Dr. Richeimer's declaration were not true or not complete.[12] This is the very situation that Justice Breyer identified—a hearing to see whether the facts as alleged before the state court, which were sufficient to make out a *Strickland* violation, were true. A hearing is particularly important where, as here, the state court decision at issue is not the ultimate determination—was Rossum

---

[12]The evidentiary hearing in this case surely could be far more narrow than the hearing at issue in *Pinholster*. Indeed, some of the concerns of the majority in *Pinholster* may be addressed more in considering the *scope* of an evidentiary hearing rather than the *fact* of it, i.e. making certain that the federal hearing does not go so far afield as to amount to the adjudication of entirely new claims.

denied her constitutional right to the effective assistance of counsel?—but the prior question—did the state court unreasonably fail to order a hearing on the facts as alleged?

My reading of *Pinholster* is bolstered by the lack of any discussion of the body of law governing discovery in federal court habeas proceedings. *Pinholster* does not mention Rule 6 of the Rules Governing Section 2254 Cases, or its own precedent in *Bracy v. Gramley*, "[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (internal quotation marks omitted).[13] By not purporting to change or overrule these standards, the Court did not intend to preclude hearings in all cases. *See also Conway v. Houk*, No. 2:07-cv-947, 2011 WL 2119373, at *3 (S.D. Ohio May 26, 2011).

And, my view of *Pinholster* is supported by post-*Pinholster* case law. *See Skipwith v. McNeil*, No. 09-60361-CIV, 2011 WL 1598829, at *4-5 (S.D. Fla. Apr. 28, 2011) (concluding on the basis of the state court record that the state court's decision involved an unreasonable factual determination based on the record and that the district court could conduct an evidentiary hearing and consider new evidence in determining whether the claim was meritorious); *Hearn v. Ryan, et al.*, No. CV 08-448-PHX-MHM, 2011 WL 1526912, at *2 (D. Ariz. Apr. 21, 2011) (holding that where a federal court finds, based solely on the state court record, that the state court's decision was unreasonable, then the federal court could hold an evidentiary hearing to determine whether the claim warrants habeas relief).

---

[13]*Bracy* is quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969), which was decided prior to adoption of Rule 6. *Bracy* explicitly states that "Habeas Corpus Rule 6 is meant to be consistent with *Harris*," and cites to the Advisory Committee's Notes on Habeas Corpus Rule 6.

*II.   Remedy*

I would thus remand for the district court to hold an evidentiary hearing on both prongs of *Strickland*. Rossum is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2) because she did not "fail[ ] to develop the factual basis of [her] claim" before the California state courts, to the extent those courts permitted her to do so. The state court denied her an evidentiary hearing which would have determined the metabolite question. Indeed, § 2254(e)(2) permits a hearing where Rossum (1) alleges facts that, if proven, would entitle her to relief, and (2) shows that she did not receive a full and fair hearing in state court. *See Karis v. Calderon*, 283 F.3d 1117, 1126-27 (9th Cir. 2002); *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005). Moreover, under *Jones v. Wood,* 114 F.3d 1002 (9th Cir. 1997), in conducting this evidentiary hearing the district judge is obligated to allow discovery, including testing de Villers's specimens for metabolites of fentanyl. *See Rossum*, 622 F.3d at 1276.

## *CONCLUSION*

For the foregoing reasons, I conclude that Rossum is entitled to an evidentiary hearing on her claim that her trial counsel rendered ineffective assistance under *Strickland*, both as to the first prong, whether her counsel's performance fell below the standard of reasonably competent counsel, and the second prong, whether Rossum was prejudiced by counsel's deficient performance. Accordingly, I would **REVERSE** the district court's denial of a writ of habeas corpus and **REMAND** for further proceedings consistent with this opinion.